J-A11023-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| CATHERINE A. DIECKMAN | : | |
| Appellant | : | No. 482 MDA 2024 |

Appeal from the PCRA Order Entered March 6, 2024
In the Court of Common Pleas of Huntingdon County Criminal Division at
No(s): CP-31-CR-0000439-1993

BEFORE: MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:         **FILED: JULY 31, 2025**

Appellant, Catherine A. Dieckman, appeals from the order entered in the Huntingdon County Court of Common Pleas, which denied her first petition filed under the Post Conviction Relief Act ("PCRA").[1]  We affirm.

The relevant facts and procedural history of this case are as follows. The Commonwealth charged Appellant with first degree murder in connection with the murder of her husband, Carl Dieckman ("Victim").  The matter proceeded to a jury trial which commenced on July 12, 1994.

The Commonwealth played for the jury a recording of a call that

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S.A. §§ 9541-9546.

Appellant made to the police on Tuesday, October 19, 1993.[2]  In the call, Appellant reported that Victim went to Delaware with a friend on Friday evening and had not returned as planned.  (*See* N.T. Trial-Day 1, 7/12/1994, at 78-80).  Appellant further reported that she had not heard from Victim since he left.  (*Id.*).  State Trooper Joseph Pierotti testified that he was assigned to investigate the missing person report and interviewed Appellant on October 20, 1993.  (*See* N.T. Trial-Day 3, 7/14/1994, at 21-22).  Appellant told Trooper Pierotti that on October 15, 1993, she dropped Victim at Centre Health and Fitness Club in State College, Pennsylvania.  (*Id.*)  From there, Victim planned to go to a car dealership in Delaware with a friend and stay in Delaware overnight.  (*Id.*)  She stated that she was unaware of who Victim planned to travel with and where he intended to stay in Delaware.  She further reported that she expected Victim to return on Sunday evening, October 16, 1993.  (*Id.*)

Shortly after the interview with Appellant, Trooper Pierotti learned that a body was discovered in the woods.  (*Id.* at 22).  The body was subsequently identified as Victim.  (*Id.*)  During the course of the investigation, Trooper Pierotti interviewed Appellant's friend, Ann Kennedy, who provided additional information about Appellant's involvement in Victim's death.  (*Id.* at 24-26).  Trooper Pierotti arranged for Ms. Kennedy to wear a recording device to record

---

[2] The parties stipulated to the authenticity of the recording.

a conversation with Appellant. (*Id.*) Shortly thereafter, the police arrested Appellant. (*Id.*)

Ann Kennedy testified that she and Appellant have been friends for three years. (*See* N.T. Trial-Day 1 at 85-87). Ms. Kennedy testified that Appellant and Victim separated for a period of time before Victim's death. (*Id.*) During the separation, Appellant started dating a man named Steve Brace and moved to Massachusetts to live with him. (*Id.*). Subsequently, Appellant returned to Pennsylvania and moved back in with Victim. (*Id.*) Ms. Kennedy testified that although Appellant moved back in with Victim, Appellant planned to divorce Victim and "get his money." (*Id.* at 88). Appellant further told Ms. Kennedy that Mr. Brace was going to visit Appellant for a weekend in October 1993. (*Id.* at 89). Appellant told Ms. Kennedy that Mr. Brace would stay with Appellant in the house for the weekend while Victim was away. (*Id.*) Appellant planned to hide all of Victim's belongings when Mr. Brace came to visit. (*Id.*) On Sunday, October 16, 1993, Appellant told Ms. Kennedy that Mr. Brace's visit had gone well, and he returned to Massachusetts that morning. (*Id.* at 90).

On the Thursday following Mr. Brace's visit, Appellant visited Ms. Kennedy at work and admitted to Ms. Kennedy that she killed Victim. (*Id.* at 90-92). Ms. Kennedy reported Appellant's admission to the police. (*Id.*). Ms. Kennedy subsequently agreed to wear a recording device for a planned conversation with Appellant. (*Id.* at 93-94). On October 22, 1993, Ms.

Kennedy had a conversation with Appellant, which was captured by the recording device. (*Id.*).

This Commonwealth played the recorded conversation for the jury. (*Id.* at 100-122). In the recording, Appellant told Ms. Kennedy that Victim did not go to Delaware on Friday. (*Id.* at 103). Rather, Appellant and Victim went to the grocery store, drove to the woods, and went for a walk. (*Id.* at 103-105). Appellant stated that she had a gun in the glove compartment of the car and then in her purse. (*Id.* at 105). Appellant told Ms. Kennedy that when Appellant and Victim were in the woods, she pulled out the gun, put it to Victim's chest, and pulled the trigger. (*Id.* at 106). When Ms. Kennedy asked if Mr. Brace really came to visit her that weekend, Appellant confirmed that he did. (*Id.* at 103). Appellant further confirmed that Mr. Brace was not involved in Victim's murder. (*Id.*)

Officer William Hurley testified that on April 7, 1994, Appellant, with her counsel present, voluntarily provided a statement to the police at the Huntingdon Police Station. (*See* N.T. Trial-Day 2, 7/13/1994, at 156-57). A recording of the statement was played for the jury. (*Id.* at 160-298). In the recording, Appellant explained that before October 15, 1993, Victim discovered a gun in the glove box of her car and confronted her about it. (*Id.* at 162-63). The next day, when she checked her car, the gun was no longer where she kept it. (*Id.*) On October 15, 1993, she and Victim traveled to State College to complete some errands. (*Id.* at 163-66). Thereafter, Victim

suggested that they drive to the woods and look at the stars. (*Id.*).

While they were in the woods, Victim tried to initiate sex with her, but she declined. (*Id.* at 168-70). Victim took out the gun that he had taken from Appellant's glove box and started poking her in the shoulder with it, inquiring whether Mr. Brace gave her the gun. (*Id.*). Victim started pressing the gun into Appellant's neck, and then her head, arguing with her about her relationship with Mr. Brace. (*Id.*). Victim demanded oral sex from Appellant while pressing the gun into her forehead. (*Id.*) Appellant complied with Victim's demands, and while Victim was distracted, she grabbed the gun and pressed it into his chest. (*Id.* at 170-71). Victim tried to take the gun back from Appellant, and during the struggle, the gun discharged, wounding Victim. (*Id.*). Appellant started to get up to go get help. Suddenly, Mr. Brace arrived, pushed Appellant aside, and shot Victim again. (*Id.*). When Appellant saw that Victim was dead, she ran to the car. (*Id.*) When she got in the car, she realized that she had the gun in her hand and dropped it on the floor of the car. (*Id.* at 171-72). Appellant stated that she does not know how Mr. Brace arrived or found them in the woods. (*Id.* at 218-21). She speculated that he may have followed them but did not recall seeing his car when she ran out of the woods. (*Id.*)

Appellant stated that when she arrived home, she could not recall anything that happened. (*Id.* at 172-73). Appellant's daughter told her that while she was out, Mr. Brace had called from a nearby store and asked for

Appellant to bring him to the house. (*Id.*). Appellant drove to Mr. Brace's location and he followed her back to the house. (*Id.*). Appellant stated that she thought Mr. Brace was acting strange during the weekend that they spent together but he did not bring up what happened to Victim. (*Id.*) Appellant continued to have no memory of what happened to Victim until after Mr. Brace left on Sunday and she found the gun on the floor of the car. (*Id.*) She had a vague flashback of the events that led to Victim's death but could not recall the specifics. (*Id.*) Appellant stated that she knew something bad happened so she decided to get rid of the gun. (*Id.*) She took the gun to a nearby wooded area and buried it. (*Id.*) Appellant stated that she still could not recall the full details of what happened to Victim when she spoke with Trooper Pierotti and Ms. Kennedy later that week, but she began to suspect that Mr. Brace was involved. (*Id.* at 176-81). While she was speaking to Ms. Kennedy at her work, Ms. Kennedy asked if Mr. Brace was involved and encouraged her to report her suspicions to the police. (*Id.*) Appellant stated that when she spoke with Ms. Kennedy again, during the conversation that was recorded, she told Ms. Kennedy that she shot Victim so that Ms. Kennedy would not report to the police that Mr. Brace killed Victim. (*Id.*)

Officer Hurley further testified that after Appellant gave the statement, Appellant directed law enforcement to the wooded area where she buried the gun. (*Id.* at 157-159). Officer Hurley recovered a .25 caliber automatic pistol in the area that Appellant indicated. (*Id.*; N.T. Trial-Day 1 at 64). Dr. Harold

Cottle, a forensic pathologist, testified that Victim sustained two gunshot wounds. (*See* N.T. Trial-Day 1 at 24-31). Dr. Cottle opined that one of the bullet wounds was not fatal and resulted from a gun that was fired in close proximity to Victim's skin. (*Id.*). This bullet exited Victim's body. (*Id.*) The second bullet wound was a contact wound where the muzzle of the firearm was pressed directly against Victim's chest and caused Victim's death within a few minutes. (*Id.* at 31). This bullet was recovered from Victim's vertebra. (*Id.*) Corporal James F. Rottmund, a forensic firearms examiner, testified that the bullet recovered from Victim's body was a .25 caliber bullet. (*Id.* at 60). He further opined that the cartridge casing found near Victim's body was discharged from the gun that was recovered from the location Appellant indicated. (*Id.* at 65).

Steve Brace testified that he began dating Appellant when he lived in Pennsylvania. (*Id.* at 157-58). Appellant moved with him to Massachusetts in the summer of 1993, and they lived together for approximately two and a half months. (*Id.*) Appellant told him very suddenly that she was going to move back to Pennsylvania. (*Id.* at 162-63). After she moved, Appellant continued to communicate with Mr. Brace, and he was unaware that Appellant moved back in with Victim. (*Id.*)

Mr. Brace attended a work conference in Washington D.C that ended on October 15, 1993. (*Id.* at 164-67). Mr. Brace made plans with Appellant to visit her for the weekend in Pennsylvania after the conference ended. (*Id.* at

169-71). On Friday, October 15, 1993, Mr. Brace left Washington D.C. at approximately 4:30 p.m. and drove to Spruce Creek, Pennsylvania. (*Id.*). He stopped at a local establishment where there was a payphone because he did not know the way to Appellant's house. (*Id.* at 171-72). Mr. Brace called Appellant's house at around 8:30 or 9:30 p.m., and Appellant's daughter, K.D., answered the phone. (*Id.* at 172). K.D. informed him that Appellant was not home but would be back soon. (*Id.*). Mr. Brace waited in his car for approximately 20 to 25 minutes until Appellant arrived to take him to her house. Mr. Brace stayed with Appellant from Friday evening until Sunday morning. (*Id.* at 173; N.T. Trial-Day 2 at 18). During his weekend at Appellant's house, he did not see any of Victim's clothing or personal belongings. (*See* N.T. Trial-Day 1 at 173). Mr. Brace further denied that he was familiar with the area where Victim's body was found and denied that he was involved with Victim's death. (*Id.* at 177).

K.D., Appellant's daughter, testified that Mr. Brace called the house on October 15, 1993, at approximately 9:00 p.m. asking for Appellant. (*See* N.T. Trial-Day 2 at 101-02). Appellant returned home shortly thereafter and left to lead Mr. Brace back to their house. (*Id.*) Before she left, Appellant instructed K.D. and her younger sister to hide anything related to Victim in a trunk before Mr. Brace arrived. (*Id.*)

Marianne Spontak testified that Victim had a life insurance policy for $29,000.00. (*Id.* at 83-85). Ms. Spontak testified that on September 17,

1993, Victim changed his beneficiaries under the policy to make Appellant the primary beneficiary, set to receive 100% of the policy proceeds.[3] (*Id.*) Patrick Driscol testified that Victim had a retirement plan that provided for $74,000.00 in benefits to his survivors upon his death. (*Id.* at 87-89). Mr. Driscol testified that on October 8, 1993, Victim filed a form to change his beneficiaries to designate Appellant as the primary beneficiary, set to receive 100% of the proceeds.[4] (*Id.*)

Appellant testified that she grew up in an abusive home and started dating Victim when she was very young. (*See* N.T. Trial-Day 3 at 117-25). Victim was abusive to her throughout their marriage and there were instances of abuse where Victim threatened Appellant with a gun. (*Id.* at 130-138). Appellant and Victim separated in 1991, and Appellant had a protection from abuse order against Victim. (*Id.* at 144-46). Thereafter, Appellant began dating Mr. Brace. This angered Victim and he threatened to kill her and Mr. Brace on multiple occasions. (*Id.* at 149-52). In June of 1993, Appellant moved to Massachusetts with Mr. Brace. (*Id.* at 162-68). Appellant and Victim maintained communication and their relationship improved. (*Id.*) Appellant and Mr. Brace began having issues in their relationship and Appellant began considering moving back to Pennsylvania. (*Id.*)

---

[3] Prior to this, Victim's daughters and two other family members were listed as the beneficiaries.

[4] Prior to this, Victim's daughters were listed as the beneficiaries.

Simultaneously, Appellant scheduled a surgery in Pennsylvania with a three-month recovery period. (*Id.*). Appellant explained that she and Victim reached a mutual agreement that they would share a house in Pennsylvania during the time leading up to and following her surgery. (*Id.*) In that time, Victim would provide for them financially, Appellant would care for the house while she could, and Victim would care for Appellant after the surgery. (*Id.*)

Appellant testified that in September of 1993, she moved back to Pennsylvania and started living with Victim. (*See* N.T. Trial-Day 4, 7/15/1994, at 1). Regarding the events that led to and followed Victim's death, Appellant testified largely in line with her April 7, 1994 statement. (*Id.* at 2-10). Appellant reiterated that she could not recall any details of Victim's death until she found the gun in the car, which brought on vague flashbacks. (*Id.*) Appellant maintained that she told Ms. Kennedy that she killed Victim to prevent Ms. Kennedy from telling the police that Mr. Brace killed Victim. (*Id.*) Appellant stated that she could not recall the full details of Victim's death until she had her first session with Dr. Joseph Silverman, a psychiatrist. (*Id.* at 53). Thereafter, she gave her statement to the police. Appellant further testified that she continued to be in contact with Mr. Brace through letters and phone calls after she was arrested. (*Id.* at 11-20). From his communication, Appellant understood that Mr. Brace wanted her to say that Ms. Kennedy killed Victim. (*Id.*) During cross examination, Appellant acknowledged that she had access to all the police records and statements in

her case prior to giving her statement to the police on April 7, 1994. (*Id.* at 29-30). Appellant further acknowledged that she told Dr. Silverman several versions of how Victim died, including telling him that Ms. Kennedy killed Victim. (*Id.* at 49-53).

Dr. Joseph Silverman testified that he interviewed Appellant on four occasions. (*Id.* at 74). The first interview occurred on November 1, 1993. (*Id.*) At the beginning of the interview, Appellant could not recall what happened to Victim. (*Id.* at 76-80). Dr. Silverman opined that Appellant had a case of psychogenic amnesia, which is a reaction caused by stress, pain or shock. (*Id.*) During the process of their conversation, the amnesia suddenly terminated. (*Id.*) Appellant recalled that she was with Victim in the woods when he pulled out the gun. (*Id.*) They argued and both began to pull on the gun. (*Id.*) The gun went off and injured Victim. (*Id.*) Appellant was frightened and ran from the scene. (*Id.*) Appellant stated that she did not know how Victim was shot a second time. (*Id.*)

The second interview occurred on December 9, 1993. (*Id.* at 81-82). During this interview, Appellant told Dr. Silverman that Victim demanded sex from her. (*Id.*) Suddenly, Mr. Brace arrived and then ran away. (*Id.*) Appellant did not clearly indicate who fired the shots that killed Victim. (*Id.*)

The third interview occurred on February 15, 1994. (*Id.* at 82). During this interview, Appellant indicated that Mr. Brace and Ms. Kennedy arrived at the scene. (*Id.*) Ms. Kennedy held the gun up to Victim's chest and then ran

away. (*Id.*) Appellant did not specify who shot Victim.

The fourth interview occurred on April 11, 1994. (*Id.* at 83). During this interview, Appellant told Dr. Silverman the same version of events that she gave during her statement to the police and at trial. (*Id.*)

Dr. Silverman further testified that he learned from Appellant's sister that Appellant had a history of developing a form of amnesia upon learning about the death of her family members. (*Id.*) Dr. Silverman opined that it was more probable than not that Appellant had amnesia regarding Victim's death before their first interview. (*Id.*) During cross examination, Dr. Silverman acknowledged that there is no absolute way of being sure as to whether any amnesia is real or faked. (*Id.* at 87).

Cathy Ribar and David Ribar, who were friends with Appellant, testified to Appellant's good character and corroborated the timeline of Appellant's relationship with Victim and Mr. Brace. (*See* N.T. Trial-Day 3 at 64-75, 87-93). Cathy Ribar further testified that Appellant told her of instances of abuse in her relationship with Victim. (*Id.* at 67-68). The Ribars further testified that Appellant and her daughters stayed with them during the week following Victim's death and Appellant was distressed and in shock. (*Id.* at 75-76, 93-96). Valerie Dong, Appellant's sister, testified to the abusive nature of their childhood home and Appellant's relationship with Victim. (*Id.* at 102-12). She further testified that Appellant refused to believe their father and grandmother were dead for a period of time after she learned of their deaths.

(*Id.* at 104, 114).

Throughout trial, the Commonwealth elicited testimony from several witnesses that Victim believed that Appellant tried to poison him on February 17, 1993, approximately eight months before his death. Specifically, Ms. Kennedy testified that Appellant told her that she put some pills in Victim's food before he went to work and Victim got into a traffic accident on his drive to work. (*See* N.T. Trial-Day 1 at 98-99). Barbara Huston, Victim's employer, testified that on February 17, 1993, Victim came into work late, was disoriented, and appeared to be intoxicated, but he did not smell of alcohol. (*Id.* at 152-54). She excused Victim for the day, and Victim got into a car accident on his way home. (*Id.*) Victim later told her that Appellant had made him chili for dinner, and he had suspicions that Appellant put something in the chili. (*Id.*) Michael Valmont, Victim's coworker, also testified that Victim thought that Appellant had put something in the chili that she made him. (*See* N.T. Trial-Day 2 at 142). Officer James E. Loesch responded to the scene of Appellant's traffic accident and testified that Appellant was slow to respond but did not appear to be intoxicated. (*Id.* at 76-78). Officer Bernard Torsell responded to a call from Victim the next day, alleging that someone vandalized his car. (*Id.* at 80-81). Officer Torsell testified that Victim could not recall anything that happened from when he left work the night before and when he woke up to find damage to his car. (*Id.*)

Appellant's counsel further asked Appellant about this incident during

her testimony. (*See* N.T. Trial-Day 3 at 157-61). Appellant acknowledged that in February of 1993, she made chili for dinner and both she and Victim ate it. (*Id.*) Appellant denied that she put anything in Victim's food or drink that night. (*Id.*) Both the Commonwealth and Appellant's counsel referenced this incident in their closing arguments. The Commonwealth recounted the relevant testimony about the alleged poisoning to support the credibility of Ms. Kennedy's testimony. (*See* N.T. Trial-Day 4 at 125-26). Appellant's counsel argued that the allegation was unbelievable. (*Id.* at 101-02). Appellant's counsel did not seek to preclude any of the testimony regarding the alleged poisoning incident, object to the Commonwealth's questioning, or request a cautionary instruction regarding the jury's consideration of this evidence.

The jury found Appellant guilty of first-degree murder on July 15, 1994. On September 2, 1994, the court sentenced Appellant to a mandatory sentence of life imprisonment. This Court affirmed the judgment of sentence on December 18, 1995, and our Supreme Court denied Appellant's petition for allowance of appeal on May 31, 1996. *See Commonwealth v. Dieckman*, 674 A.2d 313 (Pa.Super. 1995) (unpublished memorandum), *appeal denied*, 544 Pa. 654, 676 A.2d 1195 (1996).

On April 3, 1997, Appellant timely filed a *pro se* PCRA petition. The PCRA court appointed counsel and conducted several evidentiary hearings. Following an extensive period of delay, the court denied Appellant's PCRA

petition on March 6, 2024.[5]  On April 5, 2024, Appellant filed a timely notice of appeal.  On April 11, 2024, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Appellant timely complied on May 2, 2024.

Appellant raises one issue for this Court's review:

> Whether the PCRA Court erred as a matter of law in concluding that [Appellant] has failed to establish that but for [trial] counsel's error there was a reasonable probability that the outcome of her trial would have been different.

(Appellant's Brief at 2).

Appellant argues that throughout trial, the Commonwealth introduced evidence of allegations that Appellant attempted to poison Victim on a prior

---

[5] After Appellant filed her *pro se* PCRA petition, the court appointed David G. Smith to represent Appellant.  After several extensions were granted, Attorney Smith filed an amended PCRA petition on November 21, 2000, raising various claims of ineffective assistance of counsel.  The court held an evidentiary hearing on the same day.  No further action took place this in this case until July 20, 2005, when Attorney Smith filed a second amended PCRA petition.  The court held additional evidentiary hearings on December 12, 2005, April 7, 2006, June 1, 2007, and December 10, 2007.  Following another long period of inaction, on December 9, 2019, Appellant filed a *pro se* motion to appoint new counsel.  On January 7, 2020, the court appointed new counsel for Appellant, who filed a brief in support of Appellant's PCRA claims.  The court conducted oral argument on November 17, 2023, and denied Appellant's petition on March 6, 2024.  Our review of the record reveals no clear reason for the extensive periods of delay in resolving Appellant's PCRA claims.  We remind the PCRA court of its duty to adjudicate the cases before it in a timely manner.  **See Commonwealth v. Africa**, 524 Pa. 118, 126, 569 A.2d 920, 924 (1990) (stating that courts have duty to dispense justice in speedy manner in accordance with constitutional mandates).

- 15 -

occasion, in violation of Pa.R.E. 404(b).[6] Appellant asserts that evidence of the alleged prior poisoning had the prejudicial effect of showing or inferring to the jury that Appellant exhibited a criminal tendency for murder, particularly as it relates to Victim. Appellant contends that the prejudicial effect of this evidence was compounded because trial counsel did not request, and the court did not give, a curative instruction to the jury regarding the evidence. Appellant insists that introduction of the bad act evidence was not trivial but tainted the entire evidentiary picture to prejudice the credibility of Appellant's defense. Appellant concludes that but for the ineffectiveness of trial counsel, there is a reasonable probability that the outcome of the trial would have been different, and this Court should vacate the order denying her PCRA petition. We disagree.

Our standard of review of the denial of a PCRA petition is limited to examining whether the record evidence supports the court's determination and whether the court's decision is free of legal error. *Commonwealth v. Ford*, 947 A.2d 1251 (Pa.Super. 2008), *appeal denied*, 598 Pa. 779, 959 A.2d 319 (2008). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. *Commonwealth v. Boyd*, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932

---

[6] Rule 404(b) provides, in relevant part, that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b).

A.2d 74 (2007). If the record supports a post-conviction court's credibility determination, it is binding on the appellate court. ***Commonwealth v. Dennis***, 609 Pa. 442, 17 A.3d 297 (2011).

"Counsel is presumed to have rendered effective assistance." ***Commonwealth v. Hopkins***, 231 A.3d 855, 871 (Pa.Super. 2020), *appeal denied*, 663 Pa. 418, 242 A.3d 908 (2020).

> [T]o establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

***Commonwealth v. Sandusky***, 203 A.3d 1033, 1043 (Pa.Super. 2019), *appeal denied*, 654 Pa. 568, 216 A.3d 1029 (2019) (internal citations and quotation marks omitted). "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury…." ***Commonwealth v. Lesko***, 609 Pa. 128, 192, 15 A.3d 345, 383 (2011). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. ***Commonwealth v. Chmiel***, 612 Pa. 333, 30 A.3d 1111 (2011).

"In the context of an ineffectiveness claim, counsel's failure to request a cautionary instruction regarding evidence of other crimes or prior bad acts

does not constitute *per se* ineffectiveness; rather, in order to obtain relief under such a claim, a defendant must still satisfy each of the three prongs of the test for ineffective assistance of counsel." **Commonwealth v. Weiss**, 622 Pa. 663, 716, 81 A.3d 767, 798 (2013) (citation and quotation marks omitted), *abrogated on other grounds by* **Commonwealth v. Yale**, 665 Pa. 635, 249 A.3d 1001 (2021). "To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." **Commonwealth v. Spotz**, 624 Pa. 4, 33, 84 A.3d 294, 312 (2014) (citation and quotation marks omitted). "A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." **Id.** at 34, 84 A.3d at 312 (citation omitted). "[A] criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." **Hopkins, supra** at 876 (quoting **Commonwealth v. Chambers**, 570 Pa. 3, 22, 807 A.2d 872, 883 (2002)).

Additionally:

> [T]he test for prejudice in the ineffectiveness context is more exacting than the test for harmless error, and the burden of proof is on the defendant, not the Commonwealth. As a general and practical matter, it is more difficult for a defendant to prevail on a claim litigated through the lens of counsel ineffectiveness, rather than as a preserved claim of trial court error.

**Spotz, supra** at 38-39, 84 A.3d at 315 (citation omitted). "If it is clear that

Appellant has not met the prejudice prong of the ineffectiveness standard, the claim may be dismissed on that basis alone and the court need not first determine whether the first and second prongs have been met." ***Commonwealth v. Stefanowicz***, 315 A.3d 162, 173 (Pa.Super. 2024).

Instantly, the Commonwealth concedes that Appellant's claim of error has arguable merit and that trial counsel did not have a reasonable basis for failing to challenge the introduction of the prior bad acts evidence and/or request a curative instruction.[7] The PCRA court also determined that Appellant satisfied the arguable merit and reasonable basis prongs of the ineffectiveness test. Nevertheless, the court determined that Appellant failed to establish the prejudice prong of the ineffectiveness test based on the overwhelming evidence the Commonwealth presented at trial to establish Appellant's guilt.

The record supports the court's conclusion. ***See Ford, supra***. At trial, Ms. Kennedy testified that Appellant admitted to her that she killed Victim. The Commonwealth supported her testimony by presenting the recording of a conversation between Ms. Kennedy and Appellant, during which Appellant admitted that she put the gun to Victim's chest and shot Victim and affirmed that Mr. Brace was not involved. This was corroborated by Dr. Cottle's

---

[7] At the PCRA evidentiary hearings held on November 21, 2000 and April 7, 2006, trial counsel testified that he did not seek to preclude evidence of the alleged poisoning incident because he believed the allegations sounded "preposterous" and the jury would also see it as such. Therefore, counsel decided to treat the allegations as a "joke" at trial. (***See*** N.T. Evidentiary Hearing, 11/21/00, at 16-17; N.T. Evidentiary Hearing, 4/7/06, at 17-18).

testimony that Victim suffered two gunshot wounds, one of which was a contact wound where the muzzle of the firearm was pressed directly against Victim's chest. The Commonwealth also presented evidence that the gun used to kill Victim was recovered from the location where Appellant led law enforcement. Further, the Commonwealth presented evidence that Appellant had a financial motive for killing Victim because Victim designated Appellant as the primary beneficiary for his insurance policies approximately one month before his death.

Additionally, the Commonwealth presented significant evidence to undermine the credibility of Appellant's defense. The Commonwealth established that Appellant gave numerous, conflicting accounts of what happened to Victim. Appellant initially reported to police that Victim was missing, and she had not seen him since October 15, 1993. Subsequently, Appellant admitted to Dr. Silverman that she was with Appellant when he was killed but gave multiple accounts of who shot Victim. Finally, Appellant gave a statement where she admitted that she was partially holding the gun when Victim was first shot but Mr. Brace fired the second shot that killed Victim. Appellant could not provide any concrete explanation for how Mr. Brace located Appellant and Victim in the woods. Mr. Brace denied Appellant's version of events. He testified that he was unaware that Appellant was living with Victim again, unfamiliar with the area where Victim was killed, and was waiting at a local establishment that evening for Appellant to come take him

to her house. This was corroborated by K.D.'s testimony that Mr. Brace called the house when Appellant and Victim were not home and told her that he was waiting for Appellant to pick him up. K.D. further testified that Appellant instructed K.D. and her sister to hide all of Victim's belongings before Mr. Brace arrived at the house. Although Dr. Silverman opined that it was more probable than not that Appellant had amnesia regarding Victim's death, he acknowledged that there was no way to be sure if any amnesia is real or faked.

Our review of the record confirms that the Commonwealth presented overwhelming evidence to establish Appellant's guilt and challenge the credibility of Appellant's defense. Viewing the evidence in its totality, we cannot say that if the prior bad act evidence was precluded from trial, there is a reasonable probability that the outcome of the trial would have been different. **See Spotz, supra**. On this record, we discern no error in the PCRA court's determination that Appellant's ineffective assistance of counsel claim fails because she cannot establish prejudice. **See Stefanowicz, supra**; **Boyd, supra**. Accordingly, we affirm the order denying Appellant's PCRA petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>07/31/2025</u>